MONICA BERMAN, executrix,[1] vs. SUSAN ALEXANDER
& another.[2]

No. 01-P-265.

Middlesex. October 15, 2002. - January 23, 2003.

Present: JACOBS, COWIN, & KAFKER, JJ.

*Attorney at Law,* Malpractice, Negligence. *Corporation,* Stock, Purchase by
corporation of its own stock. *Sale,* Of stock. *Evidence,* Expert opinion,
Law of other jurisdiction, Collateral matter, Deposition. *Practice, Civil,*
Deposition, Complaint, Motion to amend.

In a legal malpractice action, the judge correctly directed a verdict for the
defendants (an attorney and her law firm), where the plaintiff client did not
sustain her burden of proving that the attorney's breach of a duty to her
was the proximate cause of the damage or loss she sustained, in that the
defendants' interpretation of the law regarding a stock subscription agree-
ment that was subject to Florida law had not been proven erroneous, and
the approach counseled by the attorney provided the plaintiff sure and
significant gains. [185-189]
In a civil action, the judge did not abuse his discretion in ruling on various
evidentiary issues, including not permitting testimony on the law of another
State; not permitting the plaintiff to introduce speculative, cumulative or
collateral evidence; and awarding to the defendants costs associated with
taking the deposition of the plaintiff's late-designated expert witness.
[189-191]
In a civil action, the judge did not abuse his discretion in denying the plaintiff's
motion, made a month before trial, to amend her complaint to add a claim
under G. L. c. 93A, where the addition of such a late claim could have
changed some of the defendants' strategy. [191]

CIVIL ACTION commenced in the Superior Court Department on
July 27, 1995.

The case was tried before *Isaac Borenstein,* J.

*Robert D. Cohan* for the plaintiff.

*James R. DeGiacomo* (*Susan J. Baronoff* with him) for the
defendants.

[1]Of the estate of Richard Berman.
[2]Alexander's law firm, Hinckley, Allen & Snyder.

KAFKER, J. On the advice of counsel, and in response to a demand made by her deceased husband's company, Monica Berman (Monica),[3] executrix of her husband's estate, sold back to the company 500,000 shares of its stock at $1.03 per share. Two years later, the company went public, selling at $8.50 per share. Thereafter, Monica brought a legal malpractice action against the defendants, attorney Susan Alexander and her law firm (Hinckley, Allen & Snyder), claiming that Alexander's failure to exercise reasonable care in her advice caused Monica to lose the financial benefits associated with the public offering. The trial judge directed a verdict for the defendants. On appeal, Monica challenges the directed verdict, multiple evidentiary rulings, the award to the defendants of the cost of taking the deposition of her expert, and the denial of her motion to add a claim under G. L. c. 93A. We affirm.

1. *Factual background.* In 1969, Richard Berman (Richard) founded Insta-Care, a company which distributed drugs and pharmaceutical services to long-term care facilities (Insta-Care). Richard served as president and the chief executive officer (CEO) of the company. In 1989, Insta-Care was sold to the Jack Eckerd Corporation. Richard remained president and CEO of Insta-Care, and was also made a member of the board of directors (board). In May, 1990, he executed a subscription agreement with Insta-Care which provided that Insta-Care would issue debentures, convertible to stock in the company. He was eligible under the agreement to receive 500,000 shares of stock at a price of $0.71 per share, for a total payment of $355,000. He signed a promissory note in this amount, payment upon which was due to Insta-Care in eight annual installments.

In July, 1991, Richard was diagnosed with a brain tumor. In February, 1992, Richard, who was working part-time while he underwent medical treatment, was made Insta-Care's chairman of the board instead of president and CEO, and signed an employment agreement. The employment agreement provided for a twelve-month term of employment, to begin on May 1, 1992, and required him to sell to Insta-Care 200,000 of his

---

[3]We refer to the plaintiff as Monica regardless of whether she is acting in her individual capacity or in her capacity as executrix.

500,000 shares of stock in the company no later than that date. Richard failed to return the 200,000 shares in May, 1992. In the spring of 1992, he hired Alexander to negotiate a stock repurchase agreement with Insta-Care on his behalf. Richard hoped to gain certain perquisites from Insta-Care in exchange for his return of the 200,000 shares due under the employment agreement. Paramount among the items he sought was a two-year "make whole" provision during which he would receive the difference between the value of the shares he sold to Insta-Care and the value that Insta-Care subsequently received for them at any sale or initial public offering of the company's stock. A make whole period with an end date of June 30, 1994, appears in the drafts of the stock repurchase agreement that Richard and Insta-Care exchanged during the summer of 1992.[4]

Richard died on September 9, 1992. At that time he still owed Insta-Care $266,250 for the shares. The stock repurchase agreement that Alexander was negotiating with Insta-Care remained unsigned at the time of his death. In the weeks following her husband's death, Monica spoke with Alexander. The latter expressed regret that the agreement had not been signed, and volunteered to represent Monica without charge to complete the stock repurchase agreement with Insta-Care. On October 2, 1992, Alexander forwarded a draft of the repurchase agreement to Monica. The draft reflected Insta-Care's decision to withdraw from the proposed stock repurchase agreement certain terms they had agreed to while Richard was alive.

On October 7, 1992, Monica received a letter from an attorney representing Insta-Care notifying her that Insta-Care was exercising "its right to purchase the Insta-Care Securities held by Richard S. Berman or his estate pursuant to Section 5.3(a) of the Subscription Agreement dated as of May 1, 1990 between

---

[4]Monica testified that she assumed the stock repurchase agreement's make whole provision would begin on the date the contract was signed, and continue to run for two years from that date, but her testimony was contradicted by Alexander. Alexander stated that before Monica signed the agreement, she asked Alexander to have the June 30, 1994, date extended; however, Alexander's efforts to do so were unsuccessful, and she informed Monica that Insta-Care would not agree to extend the date.

Insta-Care Holdings, Inc. and . . . the late Richard S. Berman."[5] Monica contacted Alexander, who informed her that the company's call of the stock was valid under the subscription agreement, and that she would need to comply with it. Although the subscription agreement, the promissory note, the employment agreement, and the repurchase agreement each contained provisions stating they were governed by Florida law, Alexander conceded that she did not research Florida law "on any issue" before advising Monica on the validity of the call. Rather than comply with the call, Monica signed the repurchase agreement in late October, 1992. Under the repurchase agreement, she received $515,000 (representing $1.03 per share) for the 500,000 shares, and forgiveness of the $266,250 balance outstanding on the promissory note from Richard to Insta-Care. The make whole provision in the repurchase agreement she signed ran until June 30, 1994. Monica learned in September, 1994, that Insta-Care had been sold in an offering to the public. The price per share at that time was $8.50.

Monica filed a petition to probate her husband's will on October 1, 1992. On November 23, 1992, the petition, which was unopposed, was approved by the probate and family court, and Monica was appointed executrix of the estate.

2. *Directed verdict.* The judge's grant of the defendants' directed verdict motion followed his determination that Florida law governed the question of whether the call by Insta-Care of Richard's 500,000 shares of stock was valid. He also ruled that Richard was in breach of the employment agreement upon his death, that the employment agreement survived his death, and that certain provisions of it were enforceable against his estate. He concluded that Insta-Care's call of the stock owned by Richard's estate was valid under Florida law, under § 5.3(a) of the subscription agreement, and if not under § 5.3(a), then under § 5.3(b). Because the call was valid, the judge reasoned, even if Alexander had been misguided in failing to hire a Florida attorney or otherwise research Florida law, her mistake had no effect on the terms of the agreement eventually reached between Monica and Insta-Care. Finally, the judge emphasized that

---

[5]Deposition testimony was received from the general counsel for the Jack Eckerd Corporation, who stated that he sent Monica the call letter "on behalf of Insta-Care to preserve its rights under the subscription agreement."

regardless of the status of the call, it would be "pure speculation" to conclude that Alexander's actions proximately caused damage to Monica.

3. *Discussion.* a. *Malpractice claim.* "An attorney who has not held himself out as a specialist owes his client a duty to exercise the degree of care and skill of the average qualified practitioner. An attorney who violates this duty is liable to his client for any reasonably foreseeable loss caused by his negligence." *Fishman* v. *Brooks,* 396 Mass. 643, 646 (1986) (citations omitted) (attorney liable for failing to prepare case properly and causing plaintiff to accept unreasonable settlement).[6] To support her malpractice claim, Monica relies on Alexander's failure to review Florida law or consult a member of the Florida bar before giving advice on the sale of the stock.

Monica argues that Alexander should have counseled her not to comply with the company's call of her husband's stock. She asserts that both the subscription agreement, which was governed by Florida law, and the Florida Business Corporations Act required the call to have been authorized in advance by the Insta-Care board in order to be valid. Neither source cited appears to support her contention. Section 5.3(a) of the subscription agreement only requires that "[u]pon a Purchaser's ceasing for any reason to be employed (a 'Call Event') by Insta-Care or any of its subsidiaries . . . , Insta-Care shall have the right to purchase, by delivery of a written notice (the 'Call Notice') to such Purchaser within thirty days after the date of such Call Event, and such Purchaser . . . shall be required to sell all . . . of the Insta-Care Securities . . . ." There is no express requirement in the subscription agreement that the board vote on the exercise of a particular call. The Florida Business Corporations Act, Fla. Stat. ch. 607.06401 (1990),[7] imposes restrictions on distributions by insolvent debtor corporations, and those

---

[6]The judge granted the defendants' motion in limine to prohibit Monica's counsel from referring to Alexander as a "specialist" in his opening statement. Monica's expert testified exclusively on the standard of care applicable to the "average qualified lawyer practicing business law in 1992."

[7]The language in Fla. Stat. ch. 607.06401 relied on by Monica provides:

"(1) A board of directors may authorize and the corporation may make distributions to its shareholders subject to restriction by the articles of

corporations that would be rendered insolvent by a proposed distribution.[8] As no issue has been raised regarding Insta-Care's solvency, we are doubtful that the Florida statutory provisions cited by Monica invalidate the action by Insta-Care under the subscription agreement.

Monica also ignores the additional rights provided to Insta-Care by § 5.3(b) of the subscription agreement, which would allow a notice and call of all of a purchaser's Insta-Care stock at any time prior to an initial public offering of the company.[9] If Monica had insisted that the Insta-Care board had to vote to call the shares pursuant to § 5.3(a) of the subscription agreement or the Florida insolvency statute, Insta-Care could have used § 5.3(b) of the subscription agreement at any time to call the shares. If there remained any lingering doubt, the company could have done so pursuant to a board vote.[10]

In any event, it is unnecessary for us to resolve the Florida

---

incorporation and the limitations in subsection (3). . . .

"(3) No distribution may be made, if after giving it effect:

"(a) The corporation would not be able to pay its debts as they become due in the usual course of business; or

"(b) The corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution."

[8] See *In re Toy King Distribs., Inc.*, 256 B.R. 1, 164-165 (Bankr. M.D. Fla. 2000); *Minnelusa Co.* v. *Andrikopoulos*, 929 P.2d 1321, 1323 (Colo. 1996) (applying Florida law, court stated that "[s]tock repurchase statutes are designed to protect creditors and minority stockholders from corporate mismanagement of assets"); Felman, The Financial Provisions of Florida's New Business Corporation Act — The Model Act with Anti-Takeover Twists, 15 Nova L. Rev. 1319, 1346 (1991) (Act is "carefully structured" to achieve limited purpose of avoiding insolvency).

[9] Section 5.3(b) of the subscription agreement provides that in addition to its rights under § 5.3(a), "Insta-Care shall have the right to purchase, by delivery of a Call Notice to each Purchaser, at any time prior to the Initial Public Offering all but not less than all of the outstanding Insta-Care Securities held by such Purchaser. . . ."

[10] The existence of § 5.3(b) also negates Monica's argument that the call was unenforceable because notice was not properly served under § 5.3(a), as

law questions definitively in light of our conclusion that Monica's case against Alexander founders on the causation requirement of the malpractice doctrine. "To prevail on a claim for legal malpractice, the plaintiff must show that the attorney's breach of duty was the proximate cause of the damage or loss she sustained." *Meyer* v. *Wagner*, 429 Mass. 410, 424 (1999). See *McCann* v. *Davis, Malm & D'Agostine*, 423 Mass. 558, 560 (1996) (plaintiff's burden to prove she was harmed by defendants' negligence). We do not require that attorneys "always secure optimum outcomes for their clients," nor do we hold an attorney liable "simply because another attorney, or even many other attorneys, would not have made the same recommendation under the circumstances." *Meyer* v. *Wagner*, 429 Mass. at 419-420 (citations omitted). A plaintiff will "prevail if he proves that he probably would have obtained a better result had the attorney exercised adequate skill and care." *Fishman* v. *Brooks*, 396 Mass. at 647. However, "[t]he mere possibility that the defendants' negligence caused the harm is not sufficient to take the issue to the jury." *Girardi* v. *Gabriel*, 38 Mass. App. Ct. 553, 560 (1995).

Monica proposes that Alexander should have advised her to refuse to comply with Insta-Care's call of the stock on October 7, 1992, and instead to await a suit against her by Insta-Care. If her theories on the subscription agreement and the Florida Business Corporations Act were correct, Monica argues, she would have prevailed in the suit by Insta-Care. She would then have been in a better position to dictate the terms of her resale of the stock to Insta-Care.[11] Alternatively, she could have used her refusal to sell back the shares without litigation (which, she argues, Insta-Care would have been reluctant to undertake) to

---

she had not been appointed executrix of the estate when notice was sent. Regardless of the merits of this argument, see *Maskas* v. *North Am. Acc. Ins. Co.*, 279 Mass. 523, 527 (1932) ("The authority of the administrator when appointed related to the date of the death, and action taken by him in the intervening period would become valid"), § 5.3(b) allowed Insta-Care to deliver another call notice at any time prior to an initial public offering. Notice to the executrix in the instant case is an issue of Massachusetts, not Florida, law. *Rackemann* v. *Taylor*, 204 Mass. 394, 397 (1910) (law of domicil of decedent governs settlement of his estate).

[11]As explained earlier, this argument ignores § 5.3(b) of the subscription agreement.

negotiate terms in a repurchase agreement more favorable to her. She theorizes that a more favorable repurchase agreement might have extended the make whole date beyond June 30, 1994, to a date later than the public offering, at which shares were sold for approximately eight times the amount she received. As a matter of law, this chain of conjecture does not satisfy Monica's obligation to show causation.

Monica relies heavily on *Williams* v. *Ely*, 423 Mass. 467, 476-477 (1996). The Supreme Judicial Court in *Williams* addressed the liability of attorneys who gave their opinion, with "apparent certainty," regarding the tax consequences of a particular transaction "at a time when the issue was not conclusively resolved." *Id.* at 476. Their advice proved to be wrong. The apparent certainty of their advice also "denied the plaintiffs the opportunity to assess the risk and to elect to follow alternative estate planning options." *Ibid.* Finally, it caused the plaintiffs to incur tax penalties and interest.[12] *Id.* at 471.

The evidence in *Williams* "warranted the judge's finding that the defendants were negligent and caused the plaintiffs to incur gift tax liabilities that they might not have incurred but for the defendants' negligence." *Id.* at 476. In the instant case, unlike *Williams*, the defendants' interpretation of the law has not been proven erroneous. Rather, Monica's interpretation of the subscription agreement and the Florida Business Corporations Act is strained at best. More importantly, the approach counseled by Alexander provided Monica sure and significant gains, as opposed to the high risk, confrontational gambit Monica now proposes with the benefit of hindsight. When Monica executed the repurchase agreement with Insta-Care in October, 1992, she received $515,000, a make whole period of approximately twenty months to which she had not been entitled previously, and forgiveness of the $266,250 balance due on her husband's promissory note to the company. It is pure speculation to suggest that she would have been able legitimately to repel calls for, and possibly litigation over, the shares and to hold onto

---

[12]The court in *Williams* noted that the defendants, to defeat the plaintiffs' claim, had the burden of showing that the plaintiffs obtained tax benefits that offset the penalties they incurred due to the attorneys' faulty advice. *Id.* at 477.

them until a public offering took place.[13] See *DiPiero* v. *Goodman*, 14 Mass. App. Ct. 929, 930 (1982), cert. denied, 460 U.S. 1029 (1983). Indeed, obstinate refusal to perform obligations under a contract to obtain better terms or other advantage is not without risk. See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 474 (1991).

b. *Evidentiary rulings.* Monica claims that the judge erred in several of his rulings on evidentiary matters. First, she argues that the judge should have permitted her expert on Florida law, who was one of two experts designated by her a month before trial, to testify as to how the operative language in Richard's agreements with Insta-Care would have been interpreted under Florida law.[14] Massachusetts Rule of Civil Procedure 44.1, 365 Mass. 809 (1974), provides that "[a] party who intends to raise an issue concerning the law of the United States or of any [S]tate . . . or of a foreign country shall give notice in his pleadings or other reasonable written notice. The court, in determining such law, may consider any relevant material or source, including testimony. . . . The court's determination shall be treated as a ruling on a question of law."

The decision to allow testimony on the law of another State is discretionary, as the rule provides only that the court "may" consider such testimony. The rule is also designed to provide the judge significant flexibility on how such law shall be determined. Neither testimony nor formal proof is required, as

---

[13]Without more extensive expert testimony on causation, this argument is particularly farfetched. See *Colucci* v. *Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C.*, 25 Mass. App. Ct. 107, 115 (1987); *Atlas Tack Corp.* v. *Donabed*, 47 Mass. App. Ct. 221, 227 (1999). Monica's expert testimony on causation was limited to the following:

> "I believe the average attorney would have said you can sit tight with your debenture or 500,000 shares of stock, and you can see what happens. The worst that can happen is that you'll be sued by Insta-Care or Eckerd. And the worst that can happen is — legal fees. . . ."

[14]The judge allowed testimony by Monica's other late-designated expert witness that an average qualified Massachusetts business lawyer would have hired a Florida lawyer to interpret the agreements.

was often the case under the common law.[15] The judge's approach here is consistent with the rule and the trend of modern authority that it represents, which is to consider foreign law not as a proof issue for the jury at trial, but rather as a question of law for the judge to consider and explicate in his instructions and rulings.

Monica also claims that the judge should have allowed her to present evidence that members of Insta-Care's board would not have voted to sue her over her husband's failure to return the stock, for fear that such a move could have brought negative publicity to the company. Given the speculative nature of this testimony, we conclude that the trial judge did not abuse his discretion in disallowing it. Likewise, Monica argues that the judge should have permitted in evidence obituaries and tributes to Richard, to demonstrate both his expertise and the high regard he enjoyed in the pharmaceutical industry. Memorials are not delivered under oath, nor is an epitaph an affidavit. In addition, as the judge did allow the testimony of Elliot Tertes, a friend of Richard, to testify to Richard's stature in the industry, it was well within the judge's discretion to exclude further testimony along elegiac lines, particularly in light of its potentially prejudicial nature. *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. at 482. See *Green* v. *Richmond*, 369 Mass. 47, 59-60 (1975).

Monica argues that the judge should have allowed evidence of the selling price of a company comparable to Insta-Care. As testimony was introduced as to the actual price of the sale of Insta-Care stock, the selling price of a supposedly comparable

---

[15]For an understanding of the common-law practices and procedures for determining law foreign to the jurisdiction, the problems associated therewith, and the changes signified by rule 44.1 of the Federal Rules of Civil Procedure and its State counterparts, see Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (II), 81 Harv. L. Rev. 591, 615 (1968) ("the sweep of a new broom [in rule 44.1] is felt in the omission of the word 'proof' "). See also 9 Wigmore, Evidence § 2559, at 691 (Chadbourne rev. ed. 1981) ("by the general trend of professional opinion and legislation the common law doctrine is being abandoned, and the terms of a foreign law become a question for the judge"); Miller, Federal Rule 44.1 and the "Fact" Approach to Determining Foreign Law: Death Knell for a Die-Hard Doctrine, 65 Mich. L. Rev. 615, 685 (1967) ("Because of the inapplicability of the rules of evidence and the trial court's freedom to do its own research, foreign law will not be placed in evidence. . .").

company was entirely collateral to any issue at the trial on Alexander's negligence, and was properly excluded. See *Read v. Mt. Tom Ski Area, Inc.*, 37 Mass. App. Ct. 901, 902 (1994).

Citing no authority but Mass.R.Civ.P. 26(b)(4)(C), 365 Mass. 775 (1974), which permits a judge to require that a party taking the deposition of the opposing party's expert pay the expert's reasonable fee, Monica alleges that the judge's award to the defendants of the cost of taking her (Monica's) expert's deposition was "wholly unreasonable." This expert was one of two designated by Monica in the month before the case was due to proceed to trial. "The conduct and scope of discovery is within the sound discretion of the judge. While discovery orders are reviewable on appeal from entry of a final judgment, we do not interfere with the judge's exercise of discretion in the absence of a showing of prejudicial error resulting from an abuse of discretion." *Solimene v. B. Grauel & Co., KG*, 399 Mass. 790, 799 (1987) (citations omitted). The judge stated on the second day of trial that Monica's experts "could have been known much earlier." As a condition of having them come in late, he required that Monica pay the defendants' costs of deposing them. This ruling fell within the judge's broad discretion in discovery matters. *Navarro de Cosme v. Hospital Pavia*, 922 F.2d 926, 930 (1st Cir. 1991) ("Having each party pay for adversaries' expenses in connection with the taking of depositions is a common practice where circumstances warrant, and is not 'plainly wrong' ").

c. *Denial of motion to amend complaint.* Finally, Monica alleges the judge erred when he denied her motion, also made a month before trial, to add a claim under G. L. c. 93A, § 11. Reasons justifying a judge's denial of a motion to amend a complaint include undue delay, dilatory motive on the part of the movant, and undue prejudice to the opposing party by virtue of allowance of the amendment. *Shaw v. Siegel*, 13 Mass. App. Ct. 258, 263 (1982). The judge stated on the record that the claim was brought very late, and "would have changed some of the strategy on the part of the defendant or at least could have." The ruling was within his discretion.

*Judgment affirmed.*