Sanders, J.
This is a legal malpractice action which raises issues involving the application and operation of the Financial Institutions Reform, Recovery and Enforcement Act (“FIRREA”). The plaintiff alleges that the defendants failed to file an administrative notice of claim on his behalf before a December 11,1990 “bar date” required by FIRREA, resulting in a federal court’s decision that the claim could not be made. The matter is now before the Court for a determination as to how damages should be calculated, assuming that the plaintiff is successful in demonstrating that: a) the defendants were negligent in failing to advise plaintiff to file before the December 11, 1990 “bar date”; and b) but for this negligence, the plaintiff would have been successful in the federal litigation. Specifically, the parties dispute what damages the plaintiff could potentially have recovered if the notice of claim had been filed before December 11, 1990, thus allowing the claim to be asserted in the federal litigation.
BACKGROUND[1]
In 1989, the plaintiff Roger K. Kane, Jr., as trustee of Northern Spy Really Trust, obtained a $3.8 million loan from the Home Owner’s Savings Bank (“Home Owners") to finance the construction of a golf course and clubhouse in Townsend, Massachusetts. Kane was one of the guarantors on the loan. Pursuant to the loan agreement, Kane submitted construction requisitions and, following approval of the requisitions, received advances from Home Owners. As of May 1990, Home Owners was insolvent, however. It had advanced $2.4. million to Kane or his entities.
On April 27, 1990, the Resolution Trust Corporation (“RTC”) was appointed conservator of Home Owners; as of that date, there was an outstanding construction requisition in connection with the golf course which was only partially paid. No further advances were made thereafter, nor did Kane make any further payments of interest. On September 7, 1990, the RTC was appointed receiver of Home Owners, and established a December 11, 1990 “bar date” for the filing of claims against Home Owners and the RTC as its receiver. Kane did not file an administrative claim. In 1994, RTC sued Kane and others in federal court to recover amounts owed by Kane and his entities on the Home Owners loan. Kane counterclaimed, seeking damages under FIRREA for the RTC’s alleged repudiation of the loan agreement.
Without reaching the question of what damages Kane would be entitled to receive if his counterclaim was allowed to go forward, the United States District Court held that it lacked subject matter jurisdiction over the counterclaim because Kane had failed to submit his claim to the RTC for administrative consideration by the December 11, 1990 “bar date.” The First *580 Circuit affirmed that decision, rejecting Kane’s argument that his claim for damages as a result of the RTC’s alleged repudiation of the loan agreement did not accrue before December 11, 1990 so that the “bar date” did not apply. FDIC v. Kane, 148 F.3d 36 (1st Cir. 1998). In 1995, Kane sold the golf course property for $750,000, all of which went directly to the RTC. The balance of the RTC’s claim was settled following the First Circuit’s decision for $225,000.
After the First Circuit upheld the lower court’s dismissal of his counterclaim, Kane instituted this lawsuit, alleging that the defendants, who represented him in connection with the Home Owner’s loan, were negligent in failing to advise him to file an administrative claim before December 11, 1990. He seeks to recover the money he spent in developing the golf course, estimated at approximately $1.6 million. Defendants contend that these damages would not have been recoverable under FIRREA if the counterclaim had been allowed to go forward, and thus cannot be awarded in this legal malpractice action.
DISCUSSION
The counterclaim that Kane alleges that he lost as a result of the defendants’ negligence was asserted against the RTC pursuant to FIRREA. That statute was enacted in 1989 to cope with the high number of bank failures occurring at the time. The statute expressly permits the receiver to disaffirm or repudiate any contract made before the receivership. 12 U.S.C. §1821 (e)(1). It also limits the damages which can be recoverable as a result of a repudiated contract to “actual direct compensatory damages,” determined as of the date of the appointment of the conservator or receiver. 12 U.S.C. § 1821 (e)(3)(A)(i). Although the statute does not define the term “actual direct compensatory damages,” it does expressly exempt recovery of: 1) punitive or exemplary damages; 2) damages for lost profits or opportunities; and 3) damages for pain and suffering. 12 U.S.C. §1821(e)(3)(B).
Courts have consistently interpreted these provisions against the background of Congress’ evident purpose, which was “ ‘to spread the pain,’ in a situation where the assets are unlikely to cover all claims,” and thus maximize the number of creditors who can recover some portion of what they are owed. DPJ Co., Ltd. v. FDIC, 30 F.3d 247, 248 (1st Cir. 1994); see also Nashville Lodging Co., v. RTC, 59 F3.d 236, 241 (D.C.Cir. 1995). It is also likely that Congress was concerned that the government’s liability to the insured depositors of a failed bank would be increased if the bank’s assets were depleted to pay off contract claim creditors, providing a further reason to pare back damages claims founded on repudiated contracts. Howell v. FDIC, 986 F2d 569, 570 (1st Cir. 1993). In keeping with that legislative intent, courts have limited recovery on such claims to actual out of pocket losses. See e.g. Howell v. FDIC, 986 F.2d 569 (1st Cir. 1993) (holding that bank officers could not recover severance pay under repudiated agreement); FDIC v. Cobblestone, 1992 WL 333961 (D.Mass. 1992) (no recovery for diminution in going concern value of company as a result of loss of a line of credit repudiated by receiver). Such damages have been characterized as “reliance" damages, in that they are backward looking and are intended to place a party in the position that he occupied before making the repudiated agreement. Thus, commitment fees paid to an insolvent bank to secure a line of credit have been held to be recoverable under FIRREA as reliance damages once the receiver repudiated the loan. DPJ Co., v. FIDC at 248-50; see also Hidalgo Properties, Inc. v. Wachovia Mortgage Co., 617 F.2d. 196, 198-99 (10th Cir. 1980). Similarly, a borrower whose loan agreement was repudiated could recover monthly fees it paid to the lender in return for the lender’s promise to refinance at the end of the loan period. Nashville Lodging v. RTC, 59 F.3d at 246.
The damages that Kane argues that he could have recovered against the RTC are quite different: he contends that he is entitled to be reimbursed the $1.6 million he spent on the development of the golf course. He attempts to characterize these damages as “reliance” damages in that he made the investment in reliance on obtaining full funding from Home Owners. As the cases discussed above make clear, however, the reliance damages which the courts have permitted are those expenditures incurred in order to obtain the loan, not money spent on the projects that the loan financed. Stated another way, the “actual direct compensatory damages” contemplated by FIRREA are monies which were spent to secure the repudiated loan agreement in the first place, not what the claimant stands to lose in the event that he cannot obtain replacement funding. To hold otherwise would be completely inconsistent with Congress’ intended purpose of strictly limiting recoverable damages under FIRREA for repudiated contracts. Indeed, plaintiff offers no case support for his rather extraordinary position that he is entitled to recover all that he spent on the failed project, not just the expenses incurred in connection with securing the loan.
Kane’s argument also makes little common sense. He contends that he must be reimbursed for the money he spent to develop the golf course at the same time that he is entitled to keep the golf course with its improvements, even though the improvements themselves were financed with a loan. In other words, to accept Kane’s reasoning would mean that he could borrow $1.6 million to make improvements, and then when the receiver repudiates the loan, he would no longer have an obligation to pay that amount, since, if successfully asserted as a counterclaim when the RTC seeks to collect on the loan, the amount would offset the $2.4 million which was advanced before the receiver took over. Such a result would place Kane in a position better than he would have occupied if Home Owners had not failed.
*581 Alternatively, Kane appears to argue that he is entitled to recover the “diminution in value” of the golf course as a result of the repudiation.[2] Although he is not entirely clear how that would be measured, Kane seems to be saying that this approach would entitle him to recover the difference between the partially completed project at the time the loan was repudiated and the value of the completed golf course if the loan had continued. FIRREA expressly prohibits the recovery of lost opportunities, however. In an effort to distinguish his claim from those which are not permitted by FIRREA, Kane relies on FDIC v. Parkway Executive Office Center, 1998 WL 18204 (E.D.Pa. 1998), but his reliance is misplaced. The diminution in value for which recovery was permitted in Parkway was the difference between the market value of the project with the loan agreement versus the market value of the project without the loan agreement.[3] That is, what the borrower could recover against the receiver was the “value” of the lost loan agreement, not the diminution in the value of the property based on some projection as to how much it would have been worth if completed. Indeed, even if this Court adopted Parkway’s approach, that would be of no assistance to Kane, since what he lost was essentially the ability to incur additional debt. Thus, any increase in value of the completed golf course with the loan agreement in place would (if one disregards lost profits and lost opportunity, as FIRREA requires) be directly offset by the amount of money borrowed in order to make those improvements. See FDIC v. Cobblestone, 1992 WL 333691 at *3 (which adopts the same reasoning in rejecting a claim for the loss of the “going concern” value of a company deprived of a repudiated line of credit).
Having concluded that Kane would have been limited, in the federal litigation, to recovering those costs and fees attributable to obtaining the loan agreement from Home Owners, I further conclude that this limit applies to the instant litigation to the extent that the negligence for which Kane seeks compensation is the defendants’ failure to advise him to file an administrative claim before the December 11, 1990 “bar date.” Plaintiff is entitled to recover only those damages causally related to the defendants’ negligence. Berman v. Alexander, 57 Mass.App.Ct. 181, 187 (2003). In a legal malpractice action, what that means is that the plaintiff is entitled to recover those damages which he would have recovered in the former action had it not been for his attorney’s failings. Bongiorno v. Liberty Mutual Insurance Co., 417 Mass. 396, 401 (1994) (holding that, in a third-party action under the Workers’ Compensation Act, damages in the plaintiffs legal malpractice claim are those that would have been received from third party). Once negligence is established, the consequences of that negligence are determined by a “trial within a trial” where the question is what the plaintiff would have recovered in the underlying action in the absence of such negligence. Fishman v. Brooks, 396 Mass. 643, 647 (1986). Thus, Kane is entitled to recover from his former attorneys no more than he could have recovered from the RTC in the federal litigation. The same legal limits to damages that apply to the federal action apply to the instant litigation as well.
Kane argues, however, that his damages in this action are not so limited, even if the defendants’ view of the damages recoverable against the RTC under FIRREA is accepted. In support of this position, he contends that what he lost as a result of defendants’ negligence was not just what he could have ultimately recovered against the RTC but the settlement value of his claim. First, the negligence alleged here is not a failure to settle Kane’s claim against the RTC for a reasonable amount but rather a failure to give Kane the advice necessary to preserve the claim that he had. Compare Pedro v. Gallone, 14 Mass. L. Rptr. 723, 2002 WL 1489618 (Mass.Super. 2002); see also Meyer v. Wagner, 429 Mass. 410 (1999) (improper advice in settlement of divorce action). Second and perhaps .more important, any settlement value of Kane’s claim is necessarily less than what the legal limits are to his recovexy if he were successful at trial. Thus, as the SJC has acknowledged, although cases of legal malpractice based on a lost settlement opportunity will not necessitate a trial within a trial, the recovery in that event is necessarily more limited. Fishman v. Brooks, 396 Mass. at 647, n. 1. Stated another way, if there is an amount above which plaintiff could not have recovered as a matter of law in the underlying action, then the settlement value of that underlying case is necessarily something less than the maximum recovery permissible by law.
In short, to permit Kane to recover more in the instant action than he could have possibly recovered in the claim that was negligently lost would permit the plaintiff to be placed in a better position as a result of a lawyer’s malpractice than he would have been in if the lawyer had not been negligent. That would be contrary to the purpose of tort law, which is to compensate only for those losses proximately caused by the negligence, not to award a windfall.
CONCLUSION
For all the foregoing reasons, I conclude that the damages recoverable as a result of the defendants’ alleged negligence in failing to advice Kane to file a notice of claim against the RTC before a December 11, 1990 “bar date” are limited to the costs and expenses incurred in obtaining the loan which the RTC, as Home Owners’ receiver, repudiated. Because FIRREA would not have permitted him to recover from the RTC the amounts expended on developing the golf course, he cannot recover such amounts from the defendants either.

There are significant factual disputes between the parties, none of which are relevant to the issue before the Court. The facts set forth in this section are intended only to provide *582 a context for an understanding of the damages question.

Defendants contend that this theoiy has never been asserted before nor is there any expert testimony concerning it, and accordingly, it cannot be advanced now, five years into the litigation. The Court is inclined to agree, but discusses this theory in order to eliminate any lingering questions as to its viability.

Parkway is also different on its facts, since the repudiation of the contract at issue there occurred after the RTC was appointed receiver. In the instant case, the repudiation occurred before the receiver was appointed.